# 17-1786

*To Be Argued By:*
AVI PERRY

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 17-1786

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

DAVID QUATRELLA,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### BRIEF FOR THE UNITED STATES OF AMERICA

DEIRDRE M. DALY
*United States Attorney*
*District of Connecticut*
157 Church Street, 25th Floor
New Haven, Connecticut 06510
(203) 821-3700

AVI PERRY
SANDRA S. GLOVER *(of counsel)*
*Assistant United States Attorneys*

# Table of Contents

Table of Authorities ............................................. iv

Statement of Jurisdiction .................................... x

Statement of Issues Presented for Review ........ xi

Preliminary Statement ....................................... 1

Statement of the Case ........................................ 2

    A. The offense conduct ....................................3

        1. Background on STOLI policies .............3

        2. The defendant's fraudulent policies.......5

    B. The guilty plea ...........................................7

    C. The investors' motion to be heard .............8

    D. The sentencing ........................................ 10

    E. The Rule 35(a) proceeding and
       restitution order ...................................... 17

Summary of Argument ..................................... 21

Argument............................................................ 24

I. The district court properly calculated a
   reasonable estimate of intended loss ........... 24

    A. Governing law.......................................... 24

B. Discussion ................................................ 25

II. The investors were victims entitled to
    restitution ................................................ 30

    A. Governing law ......................................... 30

    B. Discussion ............................................. 32

III. Quatrella's ineffective assistance of
    counsel claims lack merit ........................... 40

    A. Governing law ......................................... 40

    B. Discussion ............................................. 42

        1. Intended loss calculation ................... 43

        2. The investors' status as victims ......... 45

IV. The allegations of prosecutorial misconduct
    are baseless. ............................................... 48

    A. Governing law ......................................... 48

    B. Discussion ............................................. 49

V. There are no grounds for recusal and
    reassignment ............................................... 54

    A. Governing law ......................................... 54

    B. Discussion ............................................. 55

ii

Conclusion ........................................................ 60

Federal Rule of Appellate Procedure 32(g)
Certification

iii

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the Government's citation of cases does not include "certiorari denied" dispositions that are more than two years old.

## Cases

*Bell v. Miller*,
  500 F.3d 149 (2d Cir. 2007).............................. 40

*Brown v. United States*,
  167 F.3d 109 (2d Cir. 1999)....................... 41, 47

*DeLuca v. Lord*,
  77 F.3d 578 (2d Cir. 1996)............................. 47

*Giglio v. United States*,
  405 U.S. 150 (1972) ........................................ 48

*Greiner v. Wells*,
  417 F.3d 305 (2d Cir. 2005)....................... 41, 47

*Jenkins v. Artuz*,
  294 F.3d 284 (2d Cir. 2002)........................... 48

*Kensington Int'l Ltd. v. Republic of Congo*,
  461 F.3d 238 (2d Cir. 2006)....................... 55, 59

*Liteky v. United States*,
  510 U.S. 540 (1994) .................................. 55, 58

*Massaro v. United States*,
  538 U.S. 500 (2003) ........................................ 41

iv

*Mayo v. Henderson*,
13 F.3d 528 (2d Cir. 1993).............................. 41

*Mills v. Scully*,
826 F.2d 1192 (2d Cir. 1987)......................... 48

*Parisi v. United States*,
529 F.3d 134 (2d Cir. 2008)........................... 40

*Penn Mutual Life Ins. Co. v. Wolk*,
739 F. Supp. 2d 387 (S.D.N.Y. 2010).............. 5

*Sparman v. Edwards*,
154 F.3d 51 (2d Cir. 1998)
(per curiam) ................................................... 43

*Strickland v. Washington*,
466 U.S. 668 (1984) ..................... 40, 41, 44, 45

*United States v. Bazemore*,
608 Fed. Appx. 207 (5th Cir. 2015).... 27, 28, 29

*United States v. Ben Zvi*,
242 F.3d 89 (2d Cir. 2001)....................... 31, 39

*United States v. Binday*,
804 F.3d 558 (2d Cir. 2015), *cert. denied*,
136 S. Ct. 2487, and
136 S. Ct. 2488 (2016) ...........................*passim*

*United States v. Carpenter*,
190 F. Supp. 3d 260 (D. Conn. 2016)........... 4, 5

*United States v. Cohen*,
  427 F.3d 164 (2d Cir. 2005)...................... 40, 44

*United States v. DeLaura*,
  858 F.3d 738 (2d Cir. 2017)........................... 42

*United States v. Ebbers*,
  458 F.3d 110 (2d Cir. 2006)........................... 29

*United States v. Finazzo*,
  850 F.3d 94 (2d Cir. 2017)............................. 32

*United States v. Fiore*,
  381 F.3d 89 (2d Cir. 2004)............................. 31

*United States v. Grant*,
  235 F.3d 95 (2d Cir. 2000)............................. 32

*United States v. Ismail*,
  219 F.3d 76 (2d Cir. 2000)
  (per curiam)............................................... 38, 39

*United States v. Jaffe*,
  417 F.3d 259 (2d Cir. 2005)...................... 31, 32

*United States v. Jenkins*,
  578 F.3d 745 (8th Cir. 2009) ............. 27, 28, 29

*United States v. Johnson*,
  221 F.3d 83 (2d Cir. 2000)............................. 49

*United States v. Kergil*,
  No. 12 Cr. 152 (CM), 2017 WL 3726044
  (S.D.N.Y. Aug. 16, 2017) ............................... 25

vi

*United States v. Kirsh*,
  54 F.3d 1062 (2d Cir. 1995)....................... 44, 46

*United States v. Lawlor*,
  168 F.3d 633 (2d Cir. 1999)........................... 49

*United States v. Lee*,
  549 F.3d 84 (2d Cir. 2008)........................ 42, 43

*United States v. Lovaglia*,
  954 F.2d 811 (2d Cir. 1992)..................... 54, 59

*United States v. Marino*,
  654 F.3d 310 (2d Cir. 2011)........................... 30

*United States v. Ojeikere*,
  545 F.3d 220 (2d Cir. 2008).......................... 30

*United States v. Reifler*,
  446 F.3d 65 (2d Cir. 2006)....................... 30, 38

*United States v. Rigas*,
  583 F.3d 108 (2d Cir. 2009).......................... 25

*United States v. Thompson*,
  792 F.3d 273 (2d Cir. 2015).......................... 34

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013)................. 25, 42, 43

*United States v. Walker*,
  353 F.3d 130 (2d Cir. 2003)..................... 31, 38

*United States v. Yauri,*
  559 F.3d 130 (2d Cir. 2009)
  (per curiam).....................................................42

*Weingarten v. United States,*
  865 F.3d 48 (2d Cir. 2017).............................41

## Statutes

18 U.S.C. § 371.........................................2, 7, 10

18 U.S.C. § 3231.............................................x

18 U.S.C. § 3663A ............................7, 30, 31, 34

18 U.S.C. § 3664...............................31, 32, 38, 39

18 U.S.C. § 3742.............................................x

28 U.S.C. § 455..............................................54

28 U.S.C. § 1291............................................x

28 U.S.C. § 2255........................................41, 42

## Rules

Fed. R. App. P. 4 ...........................................x

Fed. R. Crim. P. 35......................................x, 17

viii

## Guidelines

U.S.S.G. § 2B1.1......................... 10, 11, 14, 24, 29

U.S.S.G. § 3B1.3................................................ 10

U.S.S.G. § 3E1.1................................................ 10

## Other Authorities

*Stranger Originated Life Insurance: Finding A
    Modern Cure for an Age-Old Problem,*
    41 Cumb. L. Rev. 569 (2011).......................... 36

*STOLI on the Rocks: Why States Should
    Eliminate the Abusive Practice of Stranger-
    Owned Life Insurance,*
    14 Conn. Ins. L.J. 521 (2008) .................... 4, 36

## Statement of Jurisdiction

The United States District Court for the District of Connecticut (Alvin W. Thompson, J.) had subject matter jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231. Judgment entered on June 5, 2017, with a notation that restitution would be determined later. Government's Appendix ("GA_") 7 (Doc. No. 44), GA380. That same day, the defendant filed a motion for resentencing under Fed. R. Crim. P. 35(a). GA7 (Doc. No. 42). On June 6, 2017, the defendant filed a timely notice of appeal pursuant to Fed. R. App. P. 4(b). GA7 (Doc. No. 46), GA384. This Court docketed the appeal as No. 17-1786.

In a hearing on July 13, 2017, the district court denied the defendant's Rule 35(a) motion, GA442, and on July 14, 2017, the district court entered a final restitution order, GA11 (Doc. No. 77), GA449. On July 24, 2017, the defendant filed a motion in this Court, seeking permission to amend his notice of appeal to include challenges to the denial of the Rule 35(a) motion and the final restitution order. No. 17-1786 (Doc. No. 34). On September 5, 2017, this Court denied the defendant's motion as moot, explaining that it construed the motion as a timely amended notice of appeal. No. 17-1786 (Doc. No. 94).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

x

**Statement of Issues
Presented for Review**

I.  Did the district court clearly err in calculating intended loss where its approach was consistent with that used in other cases, the underlying figures are undisputed, and the resulting sum reasonably accounted for anticipated profits and losses to the victim insurance companies?

II.  Did the district court properly determine that investors whom the defendant misled were victims who were entitled to restitution?

III.  Did the defendant's counsel provide ineffective assistance in allegedly failing to challenge the district court's intended loss calculation and its finding that the investors were victims where both rulings were correct and the defendant has not shown any resulting prejudice?

IV.  Should this Court take the extraordinary step of dismissing this prosecution based on the defendant's allegations of prosecutorial misconduct where he concedes that he has no evidence of misconduct?

V.  If this case is remanded, should it be reassigned to a new judge?

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 17-1786

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

DAVID QUATRELLA,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR THE UNITED STATES OF AMERICA

### Preliminary Statement

For over seven years, the defendant, David
Quatrella, participated in a multimillion-dollar
insurance fraud scheme involving "stranger-ori-
ented life insurance" ("STOLI") policies. Among
other things, Quatrella, a real estate attorney, re-
cruited a number of his law firm's clients to invest
in these policies knowing that the insurance com-

panies were unaware of the true nature of the policies. Ultimately, Quatrella pleaded guilty to conspiracy to commit wire fraud; the district court sentenced him to 36 months in prison and ordered him to pay restitution to the investors.

On appeal—with a new lawyer—Quatrella principally challenges the district court's intended loss calculation as to the victim-insurers, and its ruling that the investors also were victims who were entitled to restitution. These arguments lack merit. The district court's intended loss calculation followed the approach used by other courts, and the district court properly determined the investors to be victims. For these reasons, and because Quatrella's remaining arguments are similarly without merit, the district court's judgment should be affirmed.

## Statement of the Case

On January 4, 2017, Quatrella waived indictment and pleaded guilty to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. GA3 (Doc. Nos. 1-6), GA64. On May 25, 2017, the district court (Alvin W. Thompson, J.) sentenced Quatrella to 36 months of imprisonment and ordered him to pay restitution in an amount to be determined within 90 days of sentencing. GA6 (Doc. No. 39), GA372, GA374. On July 14, 2017, after briefing from the parties, the district court ordered Quatrella to pay restitution in the

2

amount of $1,976,558.62. GA11 (Doc. No. 77), GA449. Quatrella currently is serving his sentence.

## A. The offense conduct

### 1. Background on STOLI policies

Stranger-oriented life insurance, or "STOLI," policies became popular investments in the mid-2000s. *See United States v. Binday*, 804 F.3d 558, 565 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2487, and 136 S. Ct. 2488 (2016). A "STOLI policy is one obtained by the insured for the purpose of resale to an investor with no insurable interest in the life of the insured—essentially, it is a bet on a stranger's life." *Id.* Hedge funds and others invested in these policies, betting "that the value of a policy's death benefits would exceed the value of the required premium payments." *Id.*

Although investors liked STOLI policies as investment options, many insurance companies adopted rules to prohibit the issuance of such policies. *Id.* Insurance companies adopted these rules, in part, because STOLI policies distort the complex risk calculations on which insurers base decisions about whether, and on what terms, to issue policies. Among other things:

> Under a regular life insurance contract, a certain percentage of policyholders will surrender their policies or allow them to lapse.

3

In these cases the insurer retains all premiums which have been collected and never pays out a death benefit. Insurance companies have come to rely on this percentage and use the information to calculate premiums for all the policies they issue. STOLI transactions distort this percentage because STOLI is designed to ensure that policies never lapse and that the death benefit is always paid, just not to the original insured.

Eryn Mathews, *STOLI on the Rocks: Why States Should Eliminate the Abusive Practice of Stranger-Owned Life Insurance*, 14 Conn. Ins. L.J. 521, 529-30 (2008) (footnotes omitted); *see also Binday*, 804 F.3d at 574 ("[I]nsurers expected STOLI policies to differ economically, to the insurers' detriment, from non-STOLI policies."); *United States v. Carpenter*, 190 F. Supp. 3d 260, 268-69 (D. Conn. 2016) (describing evidence on how "STOLI policies differ from traditional policies in a number of material respects").

Insurance company rules prohibiting STOLI policies led to the fraud at issue in *Binday* and in this case: Insurance brokers and others, like Quatrella, who received commissions for new policies they helped put into place, "had a financial incentive to place STOLI policies by disguising them to the insurer as non-STOLI policies. By matching a potential insured with a STOLI investor, a broker could generate a commission on a

4

policy that would not have been issued had the insurer known the policy's true purpose." *Binday*, 804 F.3d at 565-66; *see also Carpenter*, 190 F. Supp. 3d at 260 (describing criminal fraud case involving misrepresentation of STOLI policies); *Penn Mutual Life Ins. Co. v. Wolk*, 739 F. Supp. 2d 387 (S.D.N.Y. 2010) (describing civil action alleging fraud in issuance of STOLI policy).

### 2. The defendant's fraudulent policies

From June 2008 until January 2016, Quatrella used his position as an attorney to facilitate an insurance fraud scheme involving three STOLI policies—referred to throughout this prosecution as the "D.S.," "J.S.," and "A.G." policies (based on the insureds' initials). GA21-GA22; *see also* Presentence Report ("PSR") ¶¶ 5-8.[1] In each instance, Quatrella conspired with others (including insurance brokers in California, New Jersey, and Florida) to mislead the victim insurer into issuing a policy based on material misrepresentations about the policy's purpose, the means by which the premiums would be paid, and the insured's intent to sell the policy to investors. GA21; PSR ¶ 5. Also in each instance, Quatrella recruited the initial pool of investors (who were supposed to pay the premiums until the policy could be sold to downstream investors) from

---

[1] The facts in this subsection are drawn from the factual stipulation in the plea agreement, GA21-GA22, and the presentence report.

5

among his law firm's clients. GA21-GA22; PSR ¶ 5.

Quatrella's scheme exposed the victim-insurers to over $14 million in losses. PSR ¶ 10. Ultimately, however, Quatrella and his co-conspirators could not find buyers for two of the STOLI policies; those two policies lapsed and no longer are in effect. GA21-GA22; PSR ¶¶ 6-7. The third policy was sold at a loss and remained in effect as of Quatrella's sentencing date. PSR ¶ 8. Hence, no death benefits have been paid on any of the policies, and consequently, the victim-insurers have not suffered any actual losses. PSR ¶ 10. However, the initial investors (*i.e.*, Quatrella's clients) lost nearly $2 million in the scheme. GA231, GA307, GA360, GA449.[2] Meanwhile, for his role in causing the issuance of these fraudulent policies, Quatrella earned $272,000 in commissions. GA22; PSR ¶ 9. Many (or all) of the investors were unaware that Quatrella was making money on these policies whether or not the policies ultimately were able to be resold. GA227-GA228; PSR Second Addendum at 3.

In mid-2011, while all three policies were still in effect, the Delaware Supreme Court ruled that

---

[2] At sentencing, the government calculated the investors' out-of-pocket losses at $2.7 million. Due to a post-sentencing civil settlement relating to the J.S. policy, net losses were approximately $1.9 million by the time the restitution order was entered.

6

STOLI policies were unlawful. In response, Quatrella sent several of the investors an email reassuring them—falsely—that the D.S. policy was not a STOLI policy. GA408-GA409. One of the investors requested confirmation that that was true of *all* of the investment group's policies, and Quatrella replied: "Yes. We have no STOLI policies." *Id.*

## B. The guilty plea

Quatrella pleaded guilty on January 4, 2017, to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. GA12, GA64. At the time of the guilty plea, the parties were focused on the victim-insurers' losses. GA312, GA404. The parties did not consider whether the investors, too, were victims. Thus, there was no calculation in the plea agreement of the investors' losses, and relatedly, no discussion of restitution to be paid to them. However, the plea agreement expressly stated that the payment of restitution, if any, was mandatory under 18 U.S.C. § 3663A. GA13. And during the plea hearing, the government summarized the parties' understanding concerning restitution:

> There also is an agreement concerning restitution. I will note at this time, Your Honor, that it appears that there is no actual loss in this case, so restitution may not be applicable.

7

However, if that changes, certainly the parties understand, and this is reflected in the plea agreement, that the government would bring that information to the Court's attention, and Mr. Quatrella is agreeing to pay mandatory restitution should there be any pursuant to this agreement.

GA46.

## C. The investors' motion to be heard

On March 17, 2017 (roughly two months after the guilty plea and two months prior to sentencing), counsel for certain of the investors advised the United States Probation Office by letter that those investors were seeking to be treated as victims. *See* PSR Second Addendum. A copy of the letter was provided to the government and counsel for Quatrella. *Id.* On May 11, 2017, counsel for the investors filed a motion to permit the investors to be heard in connection with Quatrella's sentencing. GA5 (Doc. No. 26). On May 16, 2017, Quatrella's attorney filed his opposition to the motion, in which he argued that the investors were not victims within the meaning of the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A: the investors "lost money," according to Quatrella's counsel, "because of the economic conditions in the secondary market— not because of the offense committed by the defendant." GA280.

8

Out of respect for how the case was charged, and because the investors' status as victims was not squarely considered at the time of the guilty plea, the government also took the position that the investors were not victims. GA404-GA405. The government made clear in its sentencing memorandum that it was "not advocating that the Court should treat these investors as victims." GA230 n.5. To provide a complete factual picture to the district court, however, the government noted as follows:

> The Government is not aware of any credible evidence that the investors were aware of the misrepresentations contained in the policy applications or otherwise were part of the conspiracy. In fact, Mr. Quatrella's crime came to light because the investors eventually discovered the misrepresentations and self-reported to [the insurance company]. All along, Mr. Quatrella presented the relevant policies to his clients as safe, legal investment opportunities.

GA231. In a footnote, the government added that "[c]ertain investors did receive, at some point, copies of the policies and applications. It is the Government's understanding that these investors relied on Mr. Quatrella's descriptions and did not inspect the documents themselves." GA231 n.6.

The district court held a hearing to decide the issue on May 23, 2017. GA6 (Doc. No. 34). Two

9

days later, the district court issued a written de-
cision finding that the investors were indeed vic-
tims and thus were entitled both to be heard in
connection with Quatrella's sentencing and to
restitution. GA316-GA320.

### D. The sentencing

At sentencing on May 25, 2017, Quatrella
faced a statutory maximum term of imprison-
ment of five years. *See* 18 U.S.C. § 371. The Sen-
tencing Guidelines calculation in the presentence
report, which the district court adopted, *see*
GA333-GA334, began with a base offense level of
6 under U.S.S.G. § 2B1.1(a)(2). PSR ¶ 19. Twenty
levels were added under U.S.S.G. § 2B1.1(b)(1)(K)
based on intended loss to the victim-insurers of
over $14 million. PSR ¶ 20. Two levels were
added under U.S.S.G. § 2B1.1(b)(10)(C) for the de-
fendant's use of sophisticated means in commit-
ting the offense. PSR ¶ 21. Another two levels
were added under U.S.S.G. § 3B1.3 because
Quatrella abused a position of trust and used a
special skill to facilitate the offense. PSR ¶ 23.
Three levels were subtracted for acceptance of re-
sponsibility under U.S.S.G. § 3E1.1, resulting in
a total offense level of 27. PSR ¶¶ 27-29. The re-
sulting Guidelines imprisonment range was 70 to
87 months, but because the offense of conviction
carried a five-year maximum sentence, the effec-
tive Guidelines sentence was 60 months. PSR
¶ 72.

10

To arrive at the intended loss figure, the court (using the government's suggested approach, as set out in the PSR) calculated the difference on each policy between the death benefit sought (*i.e.*, the policy's face value) and the expected total premium outlay over the insured's life. PSR ¶ 11. The court discounted the resulting sum by 20% to account for estimated compound interest the insurer could have earned on the premiums paid. PSR ¶ 11. The court then added to this amount any expenses and commissions the insurer paid to Quatrella and his co-conspirator on the policy. PSR ¶ 11. The total intended loss for all three policies was $14,982,714.27. PSR ¶ 10.

Counsel for the defendant objected to the intended loss calculation as "not tethered in fact." GA97. The district court overruled the objection:

> [T]he defendant objects to the 20-level increase based on the amount of intended loss reflected in Paragraphs 11 and 20. He argues that it is unreasonable and irrational to compute guidelines on the intended loss under the facts of this case.
>
> Application Note 3 to Guideline Section 2B1.1 provides that, quote, "loss is the greater of actual loss or intended loss," end quote. The Application Note states that, and I quote, "intended loss," quote, 'I', means the pecuniary harm that the defendant purposely sought to inflict and, II, includes pecuniary harm that would have

11

been impossible or unlikely to occur, for example, as in a government sting operation or in insurance fraud in which the claim exceeded the insured value," end quote.

Here the defendant purposely sought to carry through to completion the fraudulent scheme with respect to each of the [three STOLI policies], which would have resulted in the insurers paying out $15 million, $10 million and $10 million respectively.

[The proposed calculation] gives certain credits toward those amounts resulting in the intended loss figure of more than $15 million . . . .

At a minimum, this figure for the intended loss is a reasonable estimate and I believe that it accurately reflects the intended loss as defined in Application Note 3. Therefore, this objection is overruled.

GA328-GA329.

After the court resolved all objections to the Guidelines calculation, it heard from several people who spoke on behalf of Quatrella, and then from Quatrella himself. GA335-GA350. As relevant here, during Quatrella's statement, he addressed some of the investors who were present in court:

Many of you who invested in these policies and have been harmed were clients,

12

friends and people for whom I have genu-
inely sought over the years to provide the
best possible legal services I could and ad-
vice, which I hope has contributed to their
success and quality of life truly. I know that
for all or most of them that this no longer
matters, but I do want each of the investors
to know that I am deeply and sincerely
sorry.

GA349.

After hearing from all parties, the court con-
sidered their arguments for an appropriate sen-
tence in this case. Counsel for the defendant re-
quested a downward departure because the in-
tended loss figure overstated the seriousness of
the offense. GA99-GA103. The government
agreed that a below-Guidelines sentence was ap-
propriate in part because the intended loss figure
produced a higher-than-necessary result. GA232-
GA233. As an alternate measure of culpability,
the government suggested that the court look to
Quatrella's gain from the offense ($272,000).
GA232-GA233. The government observed that a
Guidelines calculation based on gain instead of
intended loss would produce a sentencing range
of 30 to 37 months. The government thus advo-
cated a three-year sentence. GA232-GA233.

The court agreed that an adjustment was war-
ranted based on the high intended loss figure, and
indicated that it would consider this factor in its
ultimate sentencing decision:

13

The defense also seeks a downward departure . . . arguing that the Guideline range based on intended loss substantially overstates the seriousness of the offense.

The Court notes that there are several ways of measuring loss in this case: The intended loss of over $14 million, which resulted in a 20-level increase; the actual gross loss to the investors of over $4 million, which would result in an 18-level increase; the net loss to the victims in the amount of $2.7 million, which would result in a 16-level increase;[3] and the gain to the defendant in the amount of $272,000, which would result in a 12-level increase.

In light of this fact, I do conclude there is a basis for a downward departure . . . . The most appropriate other increase in terms of a level increase would be an 18-level increase instead of a 20-level increase for the amount of the loss. That does not lead to a very significant adjustment to the Guidelines calculations.

---

[3] After sentencing, but before the restitution order issued, the parties stipulated that the investors' net losses were just under $2 million. GA413. This lower sum still would result in a 16-level increase under the Guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(I).

14

In addition, I have concluded that this grounds for a departure is one most appropriately considered in combination with other factors in determining an appropriate non-Guideline sentence.

GA370-GA371.

The court then identified the intended loss calculation as one factor among several that led to its ultimate sentencing decision:

I have concluded that a non-Guideline sentence below the Guideline range of 60 months is appropriate in this case based on a combination of three factors:

One, the one I've just been talking about, the fact that determining the Guidelines range using the intended loss overstates the seriousness of the offense conduct;

Second, a combination of the defendant's medical condition and his civic, charitable and public service and other good works, which although they do not rise to the level of being exceptional or extraordinary, do merit consideration;

And third, something that hasn't been mentioned today but strikes me as being unusual, the fact that one aspect of the sentencing here appears to be quite different

15

from what the parties anticipated when entering into the plea agreement.[4]

GA371. The court also explained that another factor influencing its decision was the impact of Quatrella's crime on the victim-investors:

> I'm concerned not just about the amount of the loss or how you measure the amount of the loss—which is substantial no matter how you measure it—I'm also concerned about the impact on the families of the victims. We've heard about the impact on your family of the consequences of this proceeding. The letters from the victims also make it clear that they have financial obligations. They have family circumstances because they too were trying to get children through college; they too were trying to save for retirement; and the offense conduct here has had a serious impact on them. And finally, embroiling them in a fraudulent scheme. They didn't bargain for that. They were misled about that. I can only imagine for anybody that would be a traumatic experience.

GA367.

---

[4] In context, this reference was to the court's conclusion, announced earlier, that the investors were victims in this case and thus would be entitled to restitution. *See* GA316-GA320, GA323, GA325.

16

Based on these factors, and other Section 3553(a) factors the court discussed at sentencing, the district court sentenced Quatrella to three years of imprisonment and ordered him to pay restitution to the investors in an amount to be determined within 90 days of the sentencing hearing. GA372, GA374.

## E. The Rule 35(a) proceeding and restitution order

On June 5, 2017, having procured new counsel post-sentencing, Quatrella filed a motion for re-sentencing pursuant to Federal Rule of Criminal Procedure 35(a). GA7 (Doc. No. 42). In his Rule 35(a) motion, Quatrella challenged the district court's intended loss calculation as to the victim-insurers, as well as the court's ruling that the investors were victims. As to the latter issue, Quatrella argued that the investors were knowing participants in the fraud, not victims, and that his prior counsel was ineffective in failing to attack the investors' credibility. GA7 (Doc. No. 42).

The government responded to the defendant's assertion that the investors knowingly participated in the fraud by, among other things, submitting to the district court the email in which, after the Delaware Supreme Court ruled in 2011 that STOLI policies were unlawful, some of the investors explicitly questioned Quatrella about

17

the policies in this case, and Quatrella falsely assured them, "[w]e have no STOLI policies." GA403-GA404, GA408-GA409. The government also pointed out that, upon discovering Quatrella's fraud in early 2016, the investors immediately self-reported to insurance companies. GA404.

After a hearing on July 13, 2017, the district court denied the Rule 35(a) motion. GA440-GA442. As to the intended loss calculation, the court stated:

> I think the argument with respect to intended loss calculation . . . lacks merit. It's a glaring deficiency in the argument, I will say, that there's no presentation as to what the accurate number would be.

> My conclusion, having read your papers, having reread the cases and the briefs is that the calculations in all respects were accurate.

GA441. The district court also addressed the investors' status, the performance of the defendant's prior counsel, and the defendant's suggestion that the government had improperly sided with the investors:

> I thought [the defendant's prior attorney] did an excellent job. I think he did make a strategic choice. He almost made it through the sentencing without having his client exposed to the restitution.

18

I thought he managed to negotiate with the government at the right time based on the government not having information that later came to light. That was to his client's advantage. Everybody who's a good defense lawyer knows you get in and you negotiate before the government does more investigation. The government does more investigation, the client's exposure goes way up.

Mr. Quatrella pled, as I recall, to an offense with a five-year statutory maximum. That was greatly to his benefit. And I can tell you that if he came back for re-sentencing, the sentence would be higher. It would be higher. Because I've learned things about Mr. Quatrella—I made—I accepted certain representations and presentations. I would not accept those going forward.

So I can tell you, Number 1, I thought [the defendant's prior counsel] made what I thought were wise strategic choices.

Number 2, I thought his representation was entirely effective.

Number 3, I cannot see any basis in this record for concluding that the investors made misrepresentations to the Court.

Number 4, it was my conclusion that the government had gotten additional information but was standing by the bargain it

19

had made with [the defendant], to the government's credit. They didn't give me a wink and nod. They stood by the agreement they had reached . . . . It put the onus on the counsel for the investors to come in and litigate this without assistance from the government, which would have benefited them greatly, I think.

So I think the attack on [the defendant's prior attorney's] performance is entirely without merit.

GA440-GA441.

The court also heard from the parties as to restitution. Counsel for Quatrella confirmed that, while Quatrella disputed that any restitution was appropriate (because he believed the investors were not victims), the parties had stipulated to the investors' net out-of-pocket losses ($1,976,558.62). GA413. The government asked that the entire sum be due and payable immediately and that any outstanding amount at the end of the defendant's term of imprisonment be paid at the rate of $1,000 per month. GA445. The defendant objected to this schedule, and the court responded:

I'll tell you what I'll do. I'm going to enter the order because I have to get it done timely.

. . . .

20

If you want to file a motion for adjustment, the law provides for that. You can go ahead and file something with documentation supporting me amending the restitution order.

. . . .

I'm going to enter the immediate payment based on my lack of confidence in the representations I've gotten.

GA445.

The next day, the court entered a restitution order directing Quatrella to pay $1,976,558.62 to the investors. GA449-GA453.

## Summary of Argument

I. The district court adopted a reasonable estimate of intended loss in this case. The court's approach reasonably accounted for the expected costs and profits to the insurers. Although this approach is imperfect, it is similar to approaches approved by this and other courts as a reasonable estimate of loss. Moreover, as the district court explained, it is difficult to identify a *better* alternative calculation.

II. The district court properly determined that the investors were victims who were owed restitution. The evidence both pre- and post-sentencing shows the investors were directly and proximately harmed by Quatrella's offense. Moreover,

21

although Quatrella claims the district court failed to consider his financial condition in setting a restitution schedule, the court explicitly stated that it took account of the defendant's financial resources and other assets.

III. Quatrella argues that his prior counsel was ineffective insofar as he failed to challenge the district court's intended loss calculation and ruling on the investors' status as victims. Because the record is incomplete at this time, this Court should decline to review these claims on direct appeal. In any event, Quatrella's arguments fail for three reasons. *First*, Quatrella's attorney did object to the relevant rulings. *Second*, even if Quatrella's counsel had not objected, there was no error in the court's rulings. *Third*, even assuming any error existed, Quatrella has not demonstrated any resulting prejudice.

IV. Quatrella raises the specter of prosecutorial misconduct by alleging, with no support, that the government concealed evidence that the investors were participants in (and not victims of) Quatrella's crime. But there is no evidence of the investors' complicity and, in fact, unrefuted evidence shows that Quatrella affirmatively deceived the investors as to the legality of their investments.

V. Finally, Quatrella argues that, if this case is remanded, it should be reassigned to a different

22

judge. There is no basis for reassignment, because the sentencing judge's partiality cannot reasonably be questioned. To the extent the district judge expressed (mild) impatience with defense counsel, that conduct was reasonable and based on information developed during the judicial process. Accordingly, it does not provide a basis for recusal or reassignment.

23

## Argument[5]

### I. The district court properly calculated a reasonable estimate of intended loss.

#### A. Governing law

"Loss for purposes of the fraud guideline of the United States Sentencing Guidelines is defined as the greater of actual loss or intended loss." *Binday*, 804 F.3d at 595 (internal quotation marks, brackets, and ellipsis omitted); *see also* U.S.S.G. § 2B1.1, Application Note 3(A). Intended loss, which is the relevant metric here, means "the pecuniary harm that the defendant purposely sought to inflict . . . ." U.S.S.G. § 2B1.1, Application Note 3(A)(ii).[6] "A district court is not required to calculate loss with absolute precision,

---

[5] In pleading guilty, Quatrella knowingly and voluntarily waived the right to appeal his sentence. GA16, GA43-44, GA49, GA51. Nevertheless, given the breadth and tenor of his arguments on appeal, the government has elected not to enforce the appeal waiver at this time (while reserving the right to do so in the future if appropriate). To the extent Quatrella's claim that his appeal waiver was not knowing and voluntary might suggest some broader infirmity in his guilty plea, *see* App. Br. at 16-18, he has affirmatively waived any argument to vacate his conviction, *id.* at 13, 52 (requesting new sentencing hearing).

[6] In 2015, the Sentencing Commission amended the commentary defining "intended loss" in Section 2B1.1. *See* Amendment 792. This Amendment adopted a more "subjective" measure of intended loss,

24

but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information." *Binday*, 804 F.3d at 595 (internal quotation marks omitted); *see also United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009).

This Court reviews a district court's factual findings as to loss amount for clear error and its legal conclusions *de novo*. *See Binday*, 804 F.3d at 595; *United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013).

## B. Discussion

There was no error in the district court's intended loss calculation, much less clear error. *See Binday*, 804 F.3d at 596-98 (reviewing the "method used to calculate actual losses" for clear error). For each policy at issue here, the district court first determined the difference between the death benefit sought (*i.e.*, the policy's face value) and the expected total premium outlay over the insured's life. PSR ¶ 11. The court discounted the resulting sum by 20% to account for estimated compound interest the insurer could have earned

_____

a standard that was already applicable in this Circuit. *See United States v. Kergil*, No. 12 Cr. 152 (CM), 2017 WL 3726044, at *3 (S.D.N.Y. Aug. 16, 2017) (describing Amendment 792's revision to intended loss definition and its congruence with Second Circuit law). Accordingly, this Court's prior cases on intended loss continue to provide guidance.

25

on the premiums paid. PSR ¶ 11. The court then added to this amount any expenses and commissions the insurer paid to Quatrella and his co-conspirators on the policy. PSR ¶ 11. The total intended loss for all three policies was $14,982,714.27. PSR ¶ 10.

This approach was substantially similar to how actual loss was calculated in *Binday*. There, the district court added all the death benefits and commissions paid on the policies involved in the defendants' scheme, and then subtracted any premiums received by the insurance companies. *See Binday*, 804 F.3d at 596. In part because there did not appear to be a better alternative to calculating losses in this context, this Court concluded that the approach was reasonable. *See id.* at 597.

Those same metrics—*i.e.*, death benefits, premiums, and commissions—drove the intended loss calculation here. The only difference in this case—a reduction for estimated compound interest—benefited Quatrella by lowering the intended loss amount.[7] He offers no reason why the

---

[7] The government's proposed intended loss calculation in *Binday* also included a discount for estimated compound interest. *See Binday*, 804 F.3d at 595 n.37. Because the district court ultimately elected to measure actual loss in *Binday*, and because a reduction for compound interest on premiums would have had no impact on the Guidelines calculation, this component of the formula was not tested on appeal. *See id.* at 598 n.44.

26

metrics that produced a reasonable estimate of actual loss in *Binday* were unsuited to the calculation of intended loss here. Indeed, like the defendants in *Binday*, Quatrella has not identified what variable, if any, was missing from the district court's formula, or what different methodology would have produced a better estimate of intended loss. *See id.* ("Notably, the defendants have not offered an alternative calculation for actual loss, nor is one readily apparent."); *see also* GA441 (district court noting that "[i]t's a glaring deficiency in the argument . . . that there's no presentation as to what the accurate number would be"). Thus, while Quatrella had no obligation to establish a loss amount, "the absence of a better alternative" for calculating intended loss here weighs in favor of concluding that the district court's approach was a reasonable one. *Binday*, 804 F.3d at 597.

Quatrella argues that the district court's loss figure was unduly "anchor[ed]" by the face values of the policies. *See* App. Br. at 34 ("The use of the face value of the policy to calculate loss has no basis in fact, logic or in the record in this case."). The government agrees that it would be unreasonable to base intended loss solely on face values. The two cases relied upon by the defendant, *United States v. Jenkins*, 578 F.3d 745, 749-50 (8th Cir. 2009), and *United States v. Bazemore*, 608 Fed. Appx. 207, 214-15 (5th Cir. 2015), make that

27

point persuasively. But that is not what happened here. Instead, the district court's formula *started* with the policies' face values but then used various offsets that, collectively, produced an intended loss amount more than $20 million lower than the total face value of the three policies ($35 million).

The approach used here was consistent with both *Jenkins* and *Bazemore* (in addition to *Binday*). In *Jenkins*, the district court found that "a reasonable estimate of intended loss could be made by totaling the face value of the death benefits on all of the fraudulently-obtained policies and subtracting the value of the insurance premiums that Jenkins's co-schemers intended to pay the insurers." 578 F.3d at 750. Although this formula was not challenged on appeal, the Eighth Circuit suggested it actually undercounted intended loss because it did not account for commissions paid to the defendant. *See id.* at 750 n.3. Similarly, in *Bazemore*, the Fifth Circuit rejected the government's conflation of intended loss and the "full face value of the policies." 608 Fed. Appx. at 215. The Court explained: "At a minimum, the intended loss figure must account for the premium payments Bazemore intended the policyholder to make to keep the policy in place until the insured died and death benefits could be paid." *Id.* at 214 (citing *Jenkins*, 578 F.3d at 749-50).

28

Following *Jenkins* and *Bazemore*, the district court here did not simply equate face values and intended loss. It subtracted expected premium payments to the insurers, *see Jenkins*, 578 F.3d at 750; *Bazemore*, 608 Fed. Appx. at 215, and even went a step further by crediting the defendant for anticipated interest the insurers might have earned on those premiums. The district court also included in its calculation any commissions paid to Quatrella and his co-conspirators. *See Jenkins*, 578 F.3d at 750 n.3. This multifaceted approach yielded, at a minimum, a reasonable estimate of intended loss. Because a reasonable estimate of loss is all that is required, *see Binday*, 804 F.3d at 595, there was no error here.

Even assuming *arguendo* there was some flaw, there is no basis for concluding that it affected Quatrella's sentence. The intended loss figure here of just under $15 million falls within a broad Guidelines loss band ranging from $9.5 million to $25 million. *See* U.S.S.G. § 2B1.1(b)(1)(K). A different calculation would have to reduce the intended loss amount by nearly $5.5 million to place the defendant in a lower band. With no reason to believe that an alternative loss calculation would have resulted in a lower range, there is no basis for concluding that there was any impact on Quatrella's sentence. *See United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006). That is especially true here, where the district court expressly varied below the Guidelines range to account for

29

the impact of the loss amount on the Guidelines calculation. *See* GA370-GA371.

## II. The investors were victims entitled to restitution.

### A. Governing law

The MVRA provides that a sentencing court must order a defendant who is convicted of, *inter alia*, "an offense against property . . . including any offense committed by fraud or deceit," to pay restitution to any victims of the offense. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). This includes conspiracy to commit wire fraud.

For purposes of the MVRA, a "victim" is a person who was "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2); *see also United States v. Marino*, 654 F.3d 310, 316-17 (2d Cir. 2011). A co-conspirator in the offense of conviction cannot be considered to be a victim of that offense, and thus is not entitled to restitution. *See United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006). However, "restitution under the MVRA may not be denied simply because the victim had greedy or dishonest motives, where those intentions were not *in pari materi*a with those of the defendant." *United States v. Ojeikere*, 545 F.3d 220, 223 (2d Cir. 2008).

30

The procedures to be followed in issuing a restitution order under the MVRA are set forth in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3663A(d). A sentencing court is required to order restitution in the full amount of each victim's losses without consideration of the economic circumstances of the defendant. *See* 18 U.S.C. § 3664(f)(1)(A). Conversely, the court *must* take into account the defendant's financial situation in fashioning a schedule for restitution payments. *See id.* § 3664(f)(2); *see also United States v. Jaffe*, 417 F.3d 259, 263 (2d Cir. 2005). But there is no requirement that the court specifically state on the record that, in setting the schedule, it considered the factors set forth in Section 3664(f)(2). *See United States v. Walker*, 353 F.3d 130, 134-35 (2d Cir. 2003) ("The only question we address is whether the sentencing judges must state on the record that they have considered the factors, on pain of remand. We now abandon that requirement."); *see also United States v. Fiore*, 381 F.3d 89, 98 (2d Cir. 2004).

"Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). If a dispute arises as to the schedule for restitution payments, the defendant bears the burden of proving his or her financial circumstances. *Id.*; *see also Jaffe*, 417 F.3d at 263; *United States v. Ben Zvi*, 242 F.3d 89, 100 (2d Cir.

31

2001). The court may adjust a restitution sched-
ule when a party or victim notifies the court of a
material change in the defendant's economic cir-
cumstances. *See* 18 U.S.C. § 3664(k); *see also*
*Jaffe*, 417 F.3d at 267; *United States v. Grant*, 235
F.3d 95, 99-100 (2d Cir. 2000).

This Court reviews a district court's restitu-
tion order for abuse of discretion. *See United*
*States v. Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017).
A district court abuses its discretion when the
challenged order "rests on an error of law, a
clearly erroneous finding of fact, or otherwise can-
not be located within the range of permissible de-
cisions." *Id.* (internal quotation marks omitted).

## B. Discussion

Before considering the merits of Quatrella's
challenge to the restitution order, it is important
to note that the question of the investors' status
did not emerge suddenly on the eve of sentencing,
as Quatrella now implies. *See* App. Br. at 5, 9, 14,
26. More than two months earlier, counsel for cer-
tain of the investors advised the United States
Probation Office by letter that the investors were
seeking to be treated as victims. *See* PSR Second
Addendum. Quatrella's counsel was copied on the
letter and, after the investors formally filed a mo-
tion to be heard in connection with Quatrella's
sentencing, Quatrella's counsel opposed the mo-
tion. GA280. After a hearing, the district court is-
sued a written decision finding the investors to be

32

victims of Quatrella's offense. GA316-GA320. The issue thus was carefully considered, and the ultimate determination was well within the scope of the court's discretion.

There was no dispute prior to sentencing that Quatrella recruited the investors to finance the policies at issue here. GA21. Nor was there any dispute that the investors lost money on these policies. GA306. Moreover, Quatrella did not object when the government advised the court that it was "not aware of any credible evidence that the investors were aware of the misrepresentations contained in the policy applications or otherwise were part of the conspiracy. . . . All along, Mr. Quatrella presented the relevant policies to his clients as safe, legal investment opportunities." GA231 (footnote omitted); *see also* GA311 ("[T]he government has seen no evidence in this case that the investors were somehow in on it.").

On this record, the district court properly found the investors to be victims:

> Money from investors was an essential part of the scheme to defraud the insurer[s] . . . . Misrepresenting the true nature of the scheme to the investors was necessary to get them to invest. Thus, all of the investors . . . were directly harmed as a result of the defendant's actions in helping put in place the scheme to defraud . . ., which when its true nature came to light, would materially

33

adversely affect the value of their invest-
ment. For many of the investors, he also di-
rectly harmed them by defrauding them,
specifically by getting them to make an in-
vestment by means of false and fraudulent
statements and/or omissions.

GA318.

That commonsense conclusion follows logically
from the undisputed facts that were before the
court at the time of its ruling. The investors were
directly harmed because Quatrella used their
money to fund his insurance fraud scheme, kept
them in the dark about the illegality of the poli-
cies, and thereby exposed them to pecuniary risk.
They were proximately harmed insofar as the
scheme depended on the investors supplying the
policy premium payments; the harm thus was
closely connected to the offense conduct. *See*
*United States v. Thompson*, 792 F.3d 273, 277 (2d
Cir. 2015) ("[T]he MVRA aims to limit restitution
to those harms that have a sufficiently close con-
nection to the conduct at issue." (internal quota-
tion marks and brackets omitted)). Accordingly,
the district court did not abuse its discretion in
determining that the investors were victims who
were entitled to restitution. *See* 18 U.S.C.
§ 3663A(a)(1)-(2).

Quatrella argues on appeal, however, that new
evidence—introduced    post-sentencing—shows
the investors were not victims but willing partic-

34

ipants in his crime. *See* App. Br. at 14, 28-30. Specifically, he points to his own affidavit, which was submitted to the district court during the Rule 35(a) proceeding, as proof that "the investors were in fact not STOLI virgins but this close nit [sic] investor group which had 13 years of experience investing in life insurance policies." App. Br. at 14.

But the affidavit does not actually establish that the investors participated in the fraudulent conduct. In his affidavit, the defendant described how "[m]any of the investors had invested in life insurance policies prior to the DS and JS policies, and were very familiar with the [sic] both the life settlement industry in general and premium financing in particular." GA397. The affidavit then proceeds to detail three of the investors' prior experiences with "life settlement[s]." GA398-GA399. But this paints with too broad a brush. Although the terms "life settlement" and "STOLI" sometimes are (wrongly) used interchangeably, life settlements are fundamentally different from STOLI policies:

> STOLI transactions are markedly different from viatical settlements or other situations in which policyholders decide to sell a policy that they have held for some period of time. Often a person chooses to sell his policy because of a significant change in life circumstances, such as a divorce, death of a

35

spouse, retirement, disability, or bank-
ruptcy. What makes STOLI transactions
unique, and illegal, is that they are pro-
cured at the direction of a third party inves-
tor, for the purpose of directly selling them
to said investor.

Maria Fleisher, *Stranger Originated Life Insur-
ance: Finding A Modern Cure for an Age-Old
Problem*, 41 Cumb. L. Rev. 569, 580 (2011); *see
also Binday*, 804 F.3d at 565 (drawing distinc-
tion); Eryn Mathews, *STOLI on the Rocks: Why
States Should Eliminate the Abusive Practice of
Stranger-Owned Life Insurance*, 14 Conn. Ins.
L.J. 521, 527-28 (2008). Thus, even if certain of
the investors were involved in earlier life insur-
ance policy investments with the defendant
(which he refers to as "life settlements"), there is
no evidence these were STOLI policies.

In fact, Quatrella's current counsel *conceded
precisely this point* during the Rule 35(a) hearing:
"As we stand here today we don't have evidence
that they were prior STOLI transactions with the
investors or victims as Your Honor has ruled. And
the government and I are in total agreement."
GA435. He continued: "The fact that we don't
have the evidence in the record today that there
was a fraud on the Court, we don't have the evi-
dence that there were STOLI transactions prior
with the same investors. We're in agreement."
GA437. The record on appeal is unchanged, and
thus despite what counsel argues now, there is no

36

evidence showing that the investors were involved in prior STOLI transactions or engaged in a fraud on the court.

More fundamentally, even assuming *arguendo* the earlier investments were STOLI transactions, there is no evidence the investors knew that. In fact, the record (as supplemented post-sentencing) shows just the opposite. During the Rule 35(a) proceeding, the government provided the district court with an email in which, after the Delaware Supreme Court ruled in 2011 that STOLI policies were unlawful, one of the investors explicitly questioned the defendant about the policies in this case, and the defendant falsely assured him, "[w]e have no STOLI policies." GA408-GA409. The district court specifically questioned the defendant's current counsel about this email during the Rule 35(a) hearing: "It's an inquiry from I don't know which investor, but one of them concerning an opinion from a court in Delaware, and the last statement from the defendant is, Yes, we have no STOLI policies. Is that document misleading? Out of context?" GA426. The defendant's attorney responded: "No, no. That's not my point." GA426. The court continued: "I didn't ask you what your point was. I asked you is that document misleading, forged or inaccurate in any way?" GA426. The defendant's current counsel replied: "No. That's very straightforward, Your Honor." GA426. In these circumstances, there is nothing in the record to suggest the investors

37

knowingly participated in Quatrella's offense. Thus, the concern reflected in other cases that a restitution order must not "ha[ve] the effect of treating coconspirators as 'victims,'" *Reifler*, 446 F.3d at 127, is not present here.

In addition to these substantive arguments, Quatrella claims the district court's restitution order was procedurally flawed. *See* App. Br. at 35-39. Specifically, Quatrella contends the court neglected to make the requisite findings to justify his restitution obligation being due and payable immediately, and the condition that, at the conclusion of his term of imprisonment, he pay any outstanding amount at the rate of $1,000 a month. *See id.* at 38.

Quatrella's procedural challenge to the restitution order is belied by the record. The restitution order unambiguously states that, "[p]ursuant to 18 U.S.C. § 3664(f)(2)," the district court considered "the financial resources and other assets of the Defendant, including whether any of these assets are jointly controlled; projected earnings and other income of the Defendant; and any financial obligations of the Defendant." GA451. The court was not required to say anything further on the record about the structure of the restitution order. *See Walker*, 353 F.3d at 134-35; *see also United States v. Ismail*, 219 F.3d 76, 77-78 (2d Cir. 2000) (per curiam).

To the extent that some explanation was useful (although not necessary), the court stated that

38

it lacked confidence in the defendant's representations as to his financial condition, thus tacitly rejecting the defendant's argument that he had met his burden of demonstrating he lacked the resources to pay restitution as ordered. GA446. Although based on Quatrella's representations, the presentence report reflected a negative net worth, it also listed significant assets, including two homes and four automobiles. *See* PSR ¶ 66. And despite an "interim suspension" of his law license, PSR ¶ 65, Quatrella's age, education, and training suggest a future ability to earn money, as does his spouse's employment as a real estate agent with "with one of the most well-known and profitable groups in Connecticut," PSR ¶ 47. In the absence of Quatrella "showing a restricted future earnings potential by a preponderance of the evidence," it was "entirely reasonable" for the district court "to presume future earnings in ordering restitution."[8] *Ben Zvi*, 242 F.3d at 100 (citing 18 U.S.C. § 3664(e)); *see also Ismail*, 219 F.3d at 78 (affirming restitution schedule where, *inter alia*, defendant's "MBA, his spouse's potential earnings, [and] his business background" suggested future earning potential). Accordingly, there was no abuse of discretion here.

---

[8] If Quatrella's financial circumstances change in the future, he may ask the district court to modify his payment schedule. *See* 18 U.S.C. § 3664(k).

39

### III. Quatrella's ineffective assistance of counsel claims lack merit.

#### A. Governing law

A defendant who raises an ineffective assistance claim must "(1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms'; and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." *United States v. Cohen*, 427 F.3d 164, 167 (2d Cir. 2005) (citations omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 693 (1984)). This test "is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on it." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (internal quotation marks and brackets omitted).

With respect to the first part of the *Strickland* test, which considers whether the attorney's conduct was objectively unreasonable, this Court is "mindful of the diversity of the bar and the variety of approaches effective attorneys might employ when dealing with a particular set of facts. To give appropriate deference to counsel's independent decisionmaking, we 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Parisi v. United States*, 529 F.3d 134, 141 (2d Cir. 2008) (quoting *Strickland*, 466 U.S. at 689). Moreover, "[i]n assessing the attorney's per-

40

formance, a reviewing court must judge his conduct on the basis of the facts of the particular case, viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1993) (internal citation and quotation marks omitted); *see also Weingarten v. United States*, 865 F.3d 48, 53 (2d Cir. 2017). This Court "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside." *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005). This is consistent with the principle that "[a]ctions or omissions by counsel that might be considered sound strategy do not constitute ineffective assistance." *Brown v. United States*, 167 F.3d 109, 110 (2d Cir. 1999) (internal quotation marks and ellipsis omitted).

As to the *Strickland* test's second prong, a defendant must demonstrate prejudice by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is one that that is "sufficient to undermine confidence in the outcome." *Id.*

"When faced with a claim for ineffective assistance of counsel on direct appeal, [this Court] may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subse-

41

quent petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary fact finding; or (3) decide the claim on the record before [it]." *United States v. DeLaura*, 858 F.3d 738, 743 (2d Cir. 2017).

The Supreme Court has recognized that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance," *Massaro v. United States*, 538 U.S. 500, 504 (2003), and indeed this Court has articulated a "baseline aversion to resolving ineffectiveness claims on direct review," *United States v. Vilar*, 729 F.3d 62, 98 (2d Cir. 2013) (internal quotation marks omitted); *see also United States v. Yauri*, 559 F.3d 130, 133 (2d Cir. 2009) (per curiam) ("A collateral proceeding under 18 U.S.C. § 2255 is the preferred method for such a challenge."). This Court will review an ineffective assistance claim on direct appeal only if the record is fully developed and resolution is beyond doubt. *See United States v. Lee*, 549 F.3d 84, 95 (2d Cir. 2008).

### B. Discussion

Quatrella claims his original lawyer provided constitutionally ineffective assistance by allegedly failing to challenge both the district court's intended loss calculation and its determination that the investors were victims who were owed restitution.

42

Consistent with this Court's preferred method for resolving ineffective assistance claims via habeas petitions, *see Vilar*, 729 F.3d at 98, the Court should decline to hear Quatrella's claims on direct appeal. This approach is especially appropriate here because the present record is not fully developed. The record does not include, for instance, an affidavit from Quatrella's original counsel explaining his strategy for sentencing and why he litigated this case as he did. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) (per curiam) ("[A] district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."). Given this thin record, the best course is for the Court to decline to review these claims in Quatrella's appeal in favor of a future habeas petition. *See Lee*, 549 F.3d at 95-96. However, assuming *arguendo* the Court reaches the merits of Quatrella's claims, it should have no trouble rejecting them.

## 1. Intended loss calculation

The crux of Quatrella's first ineffective assistance claim is that the district court's formula for calculating intended loss was erroneous, and his attorney should have lodged an objection. *See* App. Br. at 23-26, 32-35. He is mistaken for three separate reasons.

43

*First*, Quatrella overlooks that his prior counsel *did* object to the intended loss calculation. He explicitly argued that the calculation was "not tethered in fact." GA97-GA99. The district court treated this as an objection "to the 20-level increase based on the amount of intended loss," considered the objection, and ultimately overruled it. GA327-GA329. Hence, there was no shortcoming whatsoever in the performance of Quatrella's prior counsel, and certainly none that "fell below an objective standard of reasonableness in light of prevailing professional norms." *Cohen*, 427 F.3d at 167 (internal quotation marks omitted).

*Second*, even if Quatrella's counsel *had* failed to properly object, that failure would not support a finding of ineffective assistance because, for the reasons set forth above, *see* Part I, *supra*, there was no error in the district court's intended loss calculation. *See United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[F]ailure to make a meritless argument does not rise to the level of ineffective assistance.").

*Third*, and also as described above, even assuming *arguendo* there was some fundamental defect in Quatrella's lawyer's failure to challenge the intended loss calculation, Quatrella has not met his burden of demonstrating any resulting prejudice. *See Strickland*, 466 U.S. at 694 (describing defendant's burden to show prejudice). Because Quatrella has failed to articulate what different approach he believes the district court

44

should have used, he cannot show that an objection would have resulted in a lower Guidelines calculation. And even if Quatrella could show that the court *might* have used a different Guidelines calculation, he has not shown that a lower Guidelines calculation would have had any impact on his sentence. Accordingly, the defendant has not met his burden of showing a reasonable probability of a different outcome, *see Strickland*, 466 U.S. at 694, and the Court should reject his ineffective assistance claim.

### 2. The investors' status as victims

Quatrella's next claim is that his prior counsel was ineffective insofar as he failed to argue below that the investors were participants in, and not victims of, the offense. *See* App. Br. at 26-32.[9] He contends that this failure permitted the investors to "commit[] a fraud on the court by claiming they had no prior knowledge of STOLI policies." *Id.* at 4-5. But as the district court correctly found, there is no "basis in this record for concluding that the investors made misrepresentations to

---

[9] Quatrella's prior counsel objected to the investors being treated as victims, arguing that they were harmed by market conditions and not by Quatrella's conduct. GA280, GA299. Quatrella now makes a different argument, complaining that his lawyer should have gone further and argued that the investors were participants in the scheme.

the Court." GA441. As discussed above, this is because there was (and still is) no credible evidence of the investors' knowing participation in the defendant's scheme. Again, Quatrella's current counsel actually conceded this point during the Rule 35(a) hearing: "[W]e don't have the evidence in the record today that there was a fraud on the Court . . . ." GA437.

In these circumstances (*i.e.*, with no supporting evidence), there was nothing to be gained from seeking to paint the investors as participants in the offense, which dooms Quatrella's ineffective assistance claim. *See Kirsh*, 54 F.3d at 1071. Moreover, there was considerable downside to that tactic.[10] Impugning the investors would have undercut the defendant's effort to appear contrite. During the sentencing hearing, the defendant turned to the investors who were present and apologized to them. GA349. That show of remorse likely was intended to convince the district court that the defendant understood and regretted the consequences of his actions. It helped him plead for leniency, and indeed he received a sentence significantly below the applicable Guidelines range. Had the defendant instead attacked

---

[10] Without an affidavit from Quatrella's prior counsel, the government can only speculate about the likely rationale for his conduct. This is one place where the record is insufficiently developed to permit resolution of Quatrella's ineffective assistance claim on direct appeal.

46

the investors (as he now is doing without any ba-
sis), he would not have been positioned to make
the same appeal for mercy. Presumably, that is
what the district court meant when it said, during
the Rule 35(a) hearing, "I can tell you that if he
came back for re-sentencing, the sentence would
be higher. It would be higher. Because I've
learned things about Mr. Quatrella—I made—I
accepted certain representations and presenta-
tions. I would not accept those going forward."
GA440.

In short, there was no evidence to support the
argument that the investors knowingly partici-
pated in Quatrella's scheme, but there was a sub-
stantial risk to pursuing that argument. The stra-
tegic decision by Quatrella's prior counsel not to
pursue this course thus was a perfectly sound
one. *See Greiner*, 417 F.3d at 319 ("We will not
normally fault counsel for foregoing a potentially
fruitful course of conduct if that choice also en-
tails a significant potential downside."); *Brown*,
167 F.3d at 110; *DeLuca v. Lord*, 77 F.3d 578, 588
n.3 (2d Cir. 1996) ("A lawyer's decision not to pur-
sue a defense does not constitute deficient perfor-
mance if . . . the lawyer has a reasonable justifi-
cation for the decision.").

In sum, if this Court elects to review
Quatrella's ineffective assistance claims on the
current record, it will find those claims to be with-
out merit.

47

## IV. The allegations of prosecutorial misconduct are baseless.

Quatrella alleges that the government "passively condon[ed] a fraud on the Court *if* the investors were participants" in his offense. App. Br. at 40 (emphasis added). But again, there is no evidence that the investors *were* participants in the defendant's crime. Indeed, the record reflects just the opposite.

### A. Governing law

The deliberate deception of a court "by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotation marks omitted). "[T]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* (internal quotation marks omitted); *see also Jenkins v. Artuz*, 294 F.3d 284, 295 (2d Cir. 2002).

Ordinarily, prosecutorial misconduct consisting of failure to correct false (or misleading) evidence does not rise to the level of a constitutional violation absent some showing of prejudice, meaning there must be a reasonable probability that the evidence affected the outcome of the proceeding. *See Mills v. Scully*, 826 F.2d 1192, 1195 (2d Cir. 1987). Nevertheless, on direct appeal, this Court may ensure compliance with these

48

basic dictates through the exercise of its supervisory power, including by dismissing a prosecution that is contaminated by fundamental unfairness. *See United States v. Johnson*, 221 F.3d 83, 96 (2d Cir. 2000) ("[T]he general principle that federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts certainly applies to sentencing proceedings as well." (internal citation and quotation marks omitted)); *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999) ("Given the government's often decisive role in the sentencing context, we will not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standards of fairness.").

## B. Discussion

The defendant repeatedly accuses the government of misconduct. He infers from the government's initial opposition to the investors being considered victims that the government must have known (and failed to disclose) that the investors actually were participants in the crime. *See* App. Br. at 40-43. He asks the Court to "exercise its Supervisory Power to impose sanctions to rectify the problems caused by the Government." *Id.* at x. In requesting oral argument, he represents that he "has substantial experience with prosecuting Government Misconduct and can be of great assistance at Oral Argument if this issue is considered by the Panel" and that the prosecutor "must be available to stand before this Court and

49

if requested explained a litany of irregularities introduced by the Government." *Id.* at xi. He refers in his brief to the "epidemic of prosecutorial misconduct," *id.* at 5, and observes that the "indicia of Government misconduct although not alleged at this point . . . makes this matter a potentially sad case that would be part of the epidemic," *id.* at 15.

What the defendant does *not* do is support his bare allegations with any facts. Indeed, he concedes that he is not "in physical possession" of any evidence "that directly implicates the Government in failing to correct misstatements of the investors." *Id.* at 39-40. That is because there *is* no evidence of misstatements by the investors or misconduct by the government. Neither happened.

At the time of the guilty plea, the question of whether the investors were victims simply was not squarely addressed by the parties. GA312, GA404. It was only afterward that it became clear the investors wished to be considered victims. *See* PSR Second Addendum. The government carefully considered the issue, and out of respect for how the case was charged, the government took the position that the investors were not victims. The government consistently advocated that position, including in its sentencing memorandum, GA230-GA231, until the court had decided the issue. None of this was hidden from the district court. In particular, the government advised the

50

court that, although the government had seen no evidence "that the investors were somehow in on" the defendant's crime, GA311, "the government charged this case and negotiated a plea agreement . . . on the basis that the victims were the identified insurance companies. . . . So I'm bound by that position and that remains the position I'm advocating." GA312. The district court credited the government's conduct against Quatrella's attack: "[I]t was my conclusion that the government had gotten additional information but was standing by the bargain it had made with [the defendant], to the government's credit. They didn't give me a wink and nod. They stood by the agreement they had reached." GA441.

The government thus did not have secret knowledge of the investors' participation in the defendant's crime. To the contrary, the most reliable evidence in the record (or anywhere, as far as the government is aware)—*i.e.*, the defendant's own contemporaneous email from 2011—shows that the defendant lied to the investor group about the legality of their investments. GA408-GA409. As the defendant's current counsel put it, the email is "very straightforward." GA426. If the investors truly were part of the scheme, and as immersed in STOLI policies as the defendant claims, there is no plausible reason why the defendant would have falsely assured them in the email, "[w]e have no STOLI policies." GA408-GA409. Accordingly, there is no basis for finding

51

that the investors misled the district court, or that the government somehow acquiesced in that effort by permitting false evidence to go uncorrected.

Further, the defendant's remaining suggestions of alleged government misdeeds are similarly belied by the record. For example:

- The defendant asserts that, when he "provided sworn proof that the investors were lying about their participation, the Government made no attempt to rebut that proof." App. Br. at 41; *see also id.* at 14 (claiming the government did not counter his affidavit "with any proof controverting the evidence of the fraud on the district court"). But as described above, the government provided the district court with the email from 2011 in which Quatrella lied to certain investors. GA408-GA409; *see also* GA426 (defense counsel discussing this document).

- The defendant claims that, "[w]hen the investors moved to intervene based on their claim that they were victims, the Government did not object." App. Br. at 40. Again, that is not true. The government repeatedly took the position that the investors were not victims until the court had decided the issue. GA230-GA231, GA311-GA312.

- The defendant also faults the government for not "fil[ing] anything with the court in

52

camera to let the court know the basis for its position that the investors were not victims, . . . keeping the court in the dark." App. Br. at 41. It is not true that the government hid its rationale from the court. (It is true but irrelevant that nothing was filed in camera.) The government explained its rationale at length in its sentencing memorandum, GA230-GA231, and again during the hearing on the investors' motion, GA311-GA312.

In sum, this is not a case with any indicia of prosecutorial misconduct. Although there was no pre-plea discussion of the investors' status (and hence no promises or other obligations on the government's part), the government supported the defendant's position until the district court found that the investors were victims, GA441, and later provided the court with comfort that the investors had not misled the court, GA408-GA409. Stripped of speculation, there is no substance to the defendant's accusation. There is therefore no basis for the Court to take the extraordinary step of exercising its supervisory power to dismiss this prosecution.

53

## V. There are no grounds for recusal and re-assignment.

The defendant asks this Court not only to remand for resentencing, but to reassign his case to a different district judge. *See* App. Br. at 47-52. There is no basis for doing so. The district judge was entirely fair and considerate in his treatment of the parties and the disputed issues.

### A. Governing law

28 U.S.C. § 455 requires that a judge be recused from "any proceeding in which his partiality might reasonably be questioned." 28 U.S.C. § 455(a). The standard is whether "a reasonable person, knowing all the facts, [would] conclude that the trial judge's impartiality could reasonably be questioned." *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992), *overruled on other grounds by United States v. Yousef*, 750 F.3d 254, 261 (2d Cir. 2014). If the alleged bias stems from court proceedings, and not some "extrajudicial source," that is a significant factor weighing against recusal:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for [recusal] unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial

54

that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support [recusal] . . . . *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and woman . . . sometimes display.

*Liteky v. United States*, 510 U.S. 540, 555 (1994) (emphasis in original); *see also Kensington Int'l Ltd. v. Republic of Congo*, 461 F.3d 238, 245 (2d Cir. 2006) (denying reassignment where party neither contended judge's hostility arose from extrajudicial source nor satisfied "onerous burden" of proving judge displayed deep-seated favoritism or antagonism that made fair judgment impossible).

## B. Discussion

Quatrella claims the district court "teed off" on him and "unfairly berated him and punished him at every turn." App. Br. at 5. He also complains the district court "was extremely impatient," *id.* at 50, "pounced" on him in "outrage," *id.* at 27, expressed "strong feelings of disgust" for him, *id.* at 28, and "snapped roughly" at him, *id.* at 48. Quatrella does not actually quote any of these purportedly outrageous comments, however, and a careful review of the record belies his claims.

The record reflects that the district court carefully considered the defendant's arguments (both

55

pre- and post-sentencing) and treated him (and his counsel) with characteristic patience and respect. At sentencing, the court listened without interruption as three friends of the defendant spoke. GA334-GA342. The court then heard from the defendant's attorney and the defendant himself. GA342-GA350, GA361-GA364. The court then recessed to consider the appropriate sentence, GA364, and upon returning, carefully explained the factors it deemed most significant in this case, GA364-GA372. The court described the "serious abuse of trust that occurred in this case" and the impact of the defendant's crime on his victims, GA367, but also departed downward due, in part, to the defendant's "civic, charitable and public service and other good works, which although they do not rise to the level of being exceptional or extraordinary, do merit consideration," GA371. After imposing sentence, the court granted the defendant's motion to be permitted to voluntarily surrender two months after sentencing to begin serving his sentence. GA376.

Similarly, during the Rule 35(a) hearing, the district court listened attentively to Quatrella's current counsel's presentation without interruption. GA413-GA425. It was only afterward that the court posed two questions. GA425-GA426. After the government's remarks, the court heard from Quatrella's counsel again. GA435-GA440. This time, the court interjected when counsel mischaracterized the record:

56

MR. HAMAR: May I have a few minutes, Your Honor of rebuttal?

THE COURT: You may.

MR. HAMAR: Thank you.

Again, if it pleases the Court.

It's kind of interesting in subtext that the government and the defense are really saying the same thing, which I'm not saying before you is an ironclad 35(a) case that you must act on and grant. The government is saying the same thing. As we stand here today we don't have evidence that they were prior STOLI transactions with the investors or victims as Your Honor has ruled. And the government and I are in total agreement. The government is kind of indicating well, maybe this isn't the right loss calculation formula or maybe --

THE COURT: Could you say that again?

MR. HAMAR: The government is indicating that perhaps their loss calculation formula isn't the best or correct.

THE COURT: When did Mr. Perry say that?

MR. HAMAR: He basically said there's differing views on loss calculation and maybe our view isn't necessarily correct, but it's close enough. That's what I heard.

57

That's what I heard, to effect. And I
thought that was a fair concession because
this is a complicated area.

So I think what we're really saying is --

THE COURT: I didn't here [sic] a conces-
sion.

MR. HAMAR: Okay.

THE COURT: I heard an argument that
the calculation complied with the require-
ment that there be a reasonable calcula-
tion.

MR. HAMAR: All right, Your Honor. I'll
certainly defer to you.

GA435-GA436. After counsel finished his re-
marks, the district court denied the Rule 35(a)
motion. In so doing, the court stated:

Mr. Quatrella pled, as I recall, to an of-
fense with a five-year statutory maximum.
That was greatly to his benefit. And I can
tell you that if he came back for re-sentenc-
ing, the sentence would be higher. It would
be higher. Because I've learned things
about Mr. Quatrella—I made—I accepted
certain representations and presentations.
I would not accept those going forward.

GA440.

These circumstances do not come close to
meeting the standard for recusal. *See Liteky*, 510

58

U.S. at 555; *Kensington*, 461 F.3d at 245. There is no contention that the alleged bias here stemmed from some extrajudicial source. Nothing in the record even suggests that the district court treated Quatrella himself unduly harshly. Indeed, the court recognized Quatrella's "civic, charitable and public service and other good works," GA371, and also extended the courtesy of allowing him to self-surrender two months after sentencing, GA376.

To the extent that the court displayed (extremely mild) impatience with Quatrella's current counsel during the Rule 35(a) proceeding, it was a reasonable response to counsel's mischaracterization of the record. And the court's statement that Quatrella's sentence would be higher if he were to appear for resentencing merely reflected the significant new facts that emerged during the Rule 35(a) proceeding—including that Quatrella affirmatively lied to the investors when they questioned the legality of their investments (as evidenced by the 2011 email) and that his show of remorse at sentencing apparently was insincere. Hence, because the district court's impartiality cannot reasonably be questioned, *see Lovaglia*, 954 F.2d at 815, there are no grounds for recusal.

59

## Conclusion

For the foregoing reasons, the judgment of the district court should be affirmed.


Dated: October 2, 2017


Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT


AVI M. PERRY
ASSISTANT U.S. ATTORNEY


SANDRA S. GLOVER
Assistant U.S. Attorney *(of counsel)*

60

## Federal Rule of Appellate Procedure 32(g) Certification

This is to certify that the foregoing brief complies with the 14,000-word limitation of Second Circuit Local Rule 32.1(a)(4), in that the brief is calculated by the word processing program to contain approximately 12,556 words, exclusive of the Table of Contents, Table of Authorities, Addendum, and this Certification.

AVI M. PERRY
ASSISTANT U.S. ATTORNEY